## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| LAUREN BLAZER, ERICA SPIRES, and DAVID SANZ, | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | No. 3:18-CV-00097 |
| BUDDY GREGG MOTOR HOMES, LLC, | ) ) | |
| *Defendant*. | ) ) | |

---

## AMENDED COMPLAINT

---

## <u>PRELIMINARY STATEMENT AND INTRODUCTION</u>

1.      This is a civil action for declaratory, injunctive, and monetary relief for injuries sustained by Plaintiffs Lauren Blazer ("Blazer"), Erica Spires ("Spires"), and David Sanz ("Sanz") as a result of their employment by Buddy Gregg Motor Homes, LLC ("Buddy Gregg"), and their subsequent termination therefrom. Blazer and Spires were subjected to discriminatory and retaliatory actions on the basis of sex, and Blazer, Spires, and Sanz were retaliated against for engaging in protected activity. Buddy Gregg's actions violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (2) *et seq.* ("Title VII") and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq.* ("THRA").  Sanz also brings claims for breach of contract to pay commissions, violation of the implied covenant of good faith and fair dealing in his contract, promissory estoppel, unjust enrichment, and intentional interference with business relations.

2. Defendant Buddy Gregg operates a retail dealership engaged in selling and servicing new and used recreational vehicles ("RVs") and motor homes in the greater Knoxville, Tennessee area.

3. Defendant Buddy Gregg employs more than sixty (60) employees.

4. At all times material, Defendant Buddy Gregg was, and currently is, subject to the provisions of Title VII.

5. At all times material, Defendant Buddy Gregg was, and currently is, subject to the provisions of the THRA.

6. At all times material hereto, Buddy Gregg has maintained an openly discriminatory and hostile work environment on the basis of sex in violation of Title VII and the THRA. Its working environment has been permeated with sexual comments, offensive and obscene language, and conduct of a sexual nature. Buddy Gregg has also maintained a racially discriminatory and hostile work environment in which African-American customers and employees have been denigrated because of their race, including, but not limited to, referring to customers and employees as "niggers." This discriminatory attitude started at the top with General Manager, Travis Holifield ("Hollifield") (who discriminated against and harassed females on the basis of sex and African-Americans on the basis of race) and Sales Manager Jerald Byrne ("Byrne") (who discriminated against and harassed females on the basis of sex and African-Americans on the basis of race) being two of the most blatant violators. They were not alone, however. The entire sales force is male-dominated and sexually harassing and racially harassing remarks and conduct permeated the workplace.

7. Plaintiffs Blazer and Spires had to endure routine sexually harassing and demeaning comments by Hollifield, Byrne, and other male employees in the Buddy Gregg sales department.

2

Blazer, a married woman, was also the victim of rumors that she was having affairs with multiple male employees, including Hollifield. These rumors were false, slanderous, and malicious, and were directed at Blazer because she was the only female manager in Buddy Gregg's male-dominated sales department.

8. Spires was also subjected to sexual harassment by Hollifield and Byrne. Spires, a married woman, was the victim of remarks that she was having an affair with Sanz. This rumor was false, disparaging and malicious, and was directed at Spires because she was one of a handful of female employees in Buddy Gregg's male-dominated sales department.

9. One particularly disturbing incident occurred on or about October 25, 2016, when Hollifield, who was angry over an email that Spires had sent to Buddy Gregg's home office, called a meeting of the sales department employees, including Spires and Blazer. Hollifield embarked upon a profane, sex-based tirade using such terms as "being fucked," and saying that the Company can "suck my dick," and "we're not selling blowjobs or condoms," and similar language. He refused to allow Blazer and Spires to leave despite their repeated requests to do so. The incident was humiliating and caused both Blazer and Spires emotional distress.

10. Hollifield was an alcoholic who routinely drank at work during the day. He routinely coerced sales department employees, including Blazer, Spires, and Sanz, to ride around with him during the workday while he drank beer, bought beer for them and coerced them into drinking it with him as he told them they would "not be part of the team." On more than one occasion with either Blazer and/or Spires in the vehicle, Hollifield stopped, opened the vehicle door and urinated in public by the door in front of the females. By most workday afternoons, Hollifield was usually intoxicated.

3

11.     On or about January 18, 2017, Hollifield assaulted Sanz because Sanz had complained about shoddy repairs to a motor home that he had sold to an African American customer. Hollifield flew into a rage and was noticeably intoxicated at the time of the assault. Later that day Hollifield referred to Sanz's customer as a "big ass nigger" and threatened to have Sanz physically harmed by some of his "friends."

12.     On January 19, 2017, Blazer called Brad Cohen ("Cohen"), Buddy Gregg's President and CEO, and reported that Hollifield was out of control. Blazer told Cohen about Hollifield assaulting Sanz. She told Cohen that Byrne, with Hollifield's approval, was trying to take over her Web Department and get her fired because she was not "one of the guys." She further complained that two male salesmen in her department, Travis Smith and Justin Whitehead, who were hired to develop internet sales and were expected to report to Blazer, were taking their instructions from Byrne, with Hollifield's approval, again because of her sex. Blazer had previously complained to Hollifield that Smith and Whitehead were taking orders from Byrne and refusing to report to her because of her sex. When Hollifield declined to do anything about it, Blazer was compelled to raise the complaint to Cohen. She further complained to Cohen that females are ridiculed for taking sick days, and males are not. She also told Cohen that she and Spires have permission to leave at 5:00 p.m. to pick up their children, but when they do, they are criticized for leaving. She also complained to Cohen that if a female in the sales department was even friendly with a male employee, the female was accused of "having an affair" or "having sex" with the male employee.

13.     The following day, January 20, 2017, Cohen had a conference call with Hollifield, Byrne, Smith, Whitehead and Blazer. Cohen advised all of them that Smith and Whitehead reported to Blazer and not Byrne or Hollifield. Byrne and Hollifield were angry that Blazer had

4

reported them to Cohen, and thereafter began retaliating against Blazer until Byrne ultimately unlawfully terminated her on June 21, 2017.

14.     On or about January 25, 2017, Cohen and Don Forbes ("Forbes"), Buddy Gregg's local human resources representative, met with Sanz and Spires.  Sanz described the assault by Hollifield. He then reported to Cohen and Forbes that there were numerous problems at the dealership, including Hollifield's blatant sexual harassment of female employees, including specifically Blazer and Spires.  He also complained about Hollifield's racially discriminatory attitude toward African-American customers and employees, which Sanz believed had led to the shoddy repairs to which he and which had resulted in Hollifield's assault of him.

15.     Cohen and Forbes asked to meet with Spires about Hollifield's sexual harassment. Only after being told by Cohen that she was being "promoted," would receive a raise, and would be transferred to the Web Department, and after being assured that she would be protected from retaliation, Spires reluctantly complained about Hollifield's sexual harassment of females, including but not limited to Hollifield's sex-based, epithet-laced tirade on October 25, 2016.

16.     After Plaintiffs objected to sex discrimination (in the case of Blazer), sexual harassment (in the case of Blazer, Spires and Sanz), and racial discrimination and harassment of African-Americans (in the case of Sanz), Buddy Gregg continued to subject Blazer and Spires to unabated further sexual comments, this time primarily by Byrne, who openly discussed "tits" and "fake tits" of female customers and employees, and made an even more misogynistic comment about a female customer's "carpet matching her drapes."

17.     Byrne retaliated against Blazer by significantly understating the internet sales generated by her department and took other steps in order to set Blazer up to be fired. Cohen, Hollifield, and Byrne retaliated against Spires by removing her from the receptionist/office

5

manager position, leaving her without an assigned position for several weeks, transferring her to an undefined position in the Web Department under insufficient duties, and then eliminating the position shortly thereafter because it was unnecessary. Hollifield and Byrne retaliated against Sanz through sustained efforts to cut off his opportunities for leads and sales in an effort to cause Sanz to quit or to terminate him for poor sales. Buddy Gregg also retaliated against Sanz by loading up Sanz's sales with bogus expenses, again in an effort to force him to quit. Buddy Gregg ultimately terminated the employment of all three Plaintiffs: Spires on June 1, 2017; Blazer on June 21, 2017; and Sanz on October 13, 2017. The reasons given by Buddy Gregg for their terminations were false, conflicting, and a pretext to cover up Buddy Gregg's discriminatory and retaliatory motives.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over Plaintiffs' Title VII claims pursuant to 28 U.S.C. § 1331 and 1343(a)(4). This court has jurisdiction over Plaintiffs' discrimination and retaliation claims under the THRA, and Plaintiff Sanz's breach of contract, breach of the implied duty of good faith and fair dealing, promissory estoppel and unjust enrichment claims, pursuant to supplemental jurisdiction under 28 U.S.C. § 1367.

19.     Defendant Buddy Gregg operates its business within the Eastern District of Tennessee. All actions by Defendant alleged herein occurred within the Eastern District of Tennessee. Venue in this district court is proper under 28 U.S.C. § 1391(b)(2).

## CONDITIONS PRECEDENT TO SUIT UNDER TITLE VII

20.     Plaintiffs timely filed charges of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). Spires' EEOC charge was filed August 23, 2017, Blazer's EEOC charge was filed August 25, 2017, and Sanz's EEOC charge was filed

6

December 8, 2017. The EEOC issued right to sue notices to Blazer, Spires, and Sanz on February 28, 2018.

21.    The Plaintiffs have fulfilled all conditions precedent necessary to the institution of this action under Title VII and this suit has been timely filed.

## PARTIES

22.    Plaintiff Blazer is a citizen of the United States and a resident of Knox County, Tennessee. Blazer is a white female who was employed by Buddy Gregg on January 27, 2014. She was discriminated against and subjected to a hostile work environment because of her sex. After complaining about sex discrimination on January 19, 2017 and sexual harassment and retaliation on June 13, 2017, Blazer was terminated on June 21, 2017 in retaliation for protected activities.

23.    Plaintiff Spires is a citizen of the United States and a resident of Knox County, Tennessee. She is a white female who was employed by Buddy Gregg on April 16, 2015. Spires was discriminated against and subjected to a hostile work environment because of her sex. After she complained of sexual harassment on January 25, 2017, the hostile work environment continued, she was transferred to a position with undesignated and insufficient duties, and her job was eliminated on June 1, 2017 in retaliation for protected activities.

24.    Plaintiff Sanz is a citizen of the United States and a resident of Knox County, Tennessee. He is a male, and a Messianic Jew. Sanz was employed as a salesman by Buddy Gregg on August 24, 2015. On or about January 25, 2017, Plaintiff Sanz complained to Buddy Gregg's management and human resources about, among other things, Hollifield's sexually and racially discriminatory and harassing behavior. Plaintiff Sanz was immediately thereafter retaliated against for his protected activity by choking off his access to leads and sales, loading his sales with bogus costs and/or other charges so as to significantly reduce the commissions owed to him, and

7

condoning slanderous, false, and malicious statements about him made by another Buddy Gregg employee. Sanz complained to Buddy Gregg's human resources about retaliation in July and August 2017, but his complaints were ignored in violation of company policy. Buddy Gregg terminated Sanz on October 13, 2017 in retaliation for engaging in protected activities.

25.     Defendant Buddy Gregg Motor Homes, LLC is a Texas limited liability corporation with principal offices at 210 Magnate Drive, Ste. 100, Lafayette, LA 70508-3871. Buddy Gregg can be served with legal process through its registered agent National Registered Agents, Inc., 300 Montvue Road, Knoxville, TN 37919-5546.

## FACTUAL ALLEGATIONS

### Lauren Blazer

26.     Buddy Gregg hired Blazer in January 2014 as a retail salesperson. She was the only female in an otherwise all male sales force. In approximately the Fall of 2014, Cohen promoted Blazer to the Internet/Marketing Manager ("Web Department Manager") position. She also began reporting directly to Cohen at that time. In approximately January 2015, she was given a raise and converted to a salary of $3,000 per month, plus a 4% commission based on sales generated through internet leads.

27.     As the Web Department Manager, Plaintiff Blazer was responsible for internet marketing, managing design and content for Buddy Gregg's website, created, edited, updated all website contact and developed its presence on its social media sites. While partnering with internet vendors Big Wheel and SYS2K, Plaintiff Blazer was able to increase Buddy Gregg's overall web traffic by 34%, organic search engine traffic by 50%, total number of leads by 35% and PPC leads by 65%. Additionally, Blazer's work for Buddy Gregg on social media resulted in website traffic that was over 329% higher than similar-sized competitors (according to Google Analytics'

8

Benchmarking Data).  Plaintiff Blazer also oversaw the successful launch of Buddy Gregg's newest website developed by SYS2K, which played a large role in increasing web traffic and leads. Plaintiff Blazer used her extensive photography experience and knowledge of Photoshop to provide Buddy Gregg with numerous graphic designs for billboards, banners, the website, flyers and advertising.  Plaintiff Blazer was responsible for web development and pictures for all new and used inventory which played a significant role in increasing Google searches and sales campaigns. She also organized web content, ensured that it was fresh, edited, and monitored search engine optimization.

28.     Blazer's hard work and successful internet marketing strategies were rewarded by Buddy Gregg through two subsequent $6,000 per year salary increases, approved by Cohen, to $3,500 per month (plus the 4% commission) in fall of 2016 and to $4,000 per month (plus the 4% commission) in approximately January 2017.  In less than five months after receiving the last performance-based raise, Byrne successfully arranged for Blazer to report to him in May 2017, and terminated her employment on June 21, 2017, because of her sex and in retaliation for complaining about sex harassment and retaliation.

29.     During her employment, Blazer was subjected to an openly hostile and demeaning attitude toward female employees and toward herself as the only female manager in the sales department.  The work environment in the sales department was permeated with sexual comments, offensive and obscene language and conduct of a sexual nature.  During her employment, Blazer was also the subject of constant rumors that she was having affairs with multiple Buddy Gregg male employees, including Hollifield.  The rumors were false and malicious, and severely damaged her reputation throughout Buddy Gregg.

9

30.     The sex discrimination and sexual harassment started at the top with General Manager Hollifield and his replacement, Sales Manager Byrne. Hollifield routinely referred to Blazer in front of other male managers and male salesmen as "tits" "fancy pants" and "tits and ass." Male managers and salesmen routinely discussed "great tits," "fake boobs," and/or "fake tits" in front of Blazer (and Spires). Blazer and another female employee (a warranty clerk) were routinely ridiculed and discussed in lurid terms because they had had breast augmentation surgery. Aside from referring to Blazer as "tits" and similar misogynistic names, Hollifield and other male employees continuously made comments about Blazer's breasts.

31.     Hollifield was terminated in April 2017. He was replaced by Byrne who continued the top down sexually discriminatory actions and hostile work environment. For example, on or about May 15, 2017, Byrne was talking with finance manager Justin Whitehead (loud enough for Blazer and Spires to hear) about how great some other man's wife looked with a new "set of boobs," how "smoking hot" she was, etc. When Whitehead said that he was going to get his wife "a pair," Byrne told him not to do it, that it would be a guaranteed divorce, that he (Byrne) had given a "set" to his first and second wives, that he spent $16,000 on one "set," and they cost him two divorces.

32.     As another example, on May 17, 2017, Byrne, Blazer, and Spires were standing outside the dealership office and a salesman, Mark Rothenberg, came up while he had two customers in a nearby coach. Rothenberg said they were here for delivery of a coach. Byrne replied, "Oh yeah, I saw the fake tits coming off the golf cart. I should have known it was her," or words to that effect.

33.     Blazer was, and is, married with children. Blazer routinely worked through lunch so that she could leave at 5:00 p.m. Although Blazer was given permission by her supervisor,

Cohen, to leave at 5:00 p.m. to pick up her child, Hollifield and Byrne nevertheless criticized her for leaving when she did. Hollifield and Byrne also criticized Blazer for having to take time off for her child's doctor's appointments or to care for a sick child.

34. Between October 2016 and January 2017, Blazer was assigned to perform finance and insurance work which was severely backlogged. She was given the raise to $3,500 per month plus 4% of the finance and insurance profits, and 4% of the internet sales. This assignment significantly limited the time Blazer could spend managing the Web Department. The Web Department had been averaging three to five (3-5) sales per month before October 2016. Between October 2016 and December 2016, the Web Department was credited for only one (1) sale in three months. Shortly after Cohen came to the Knoxville dealership on January 25, 2017, he returned Blazer to working full time in the Web Department and gave her another $500 per month ($6,000 per year) raise to a salary of $48,000 per year plus the 4% commission on internet sales.

35. After Blazer complained to Cohen on January 19, 2017, about Byrne's efforts to take over her department, Byrne retaliated through a series of actions designed to place Blazer and the Web Department in a poor light by understating the internet leads generated by her department and misleading Cohen about Blazer's performance. After Hollifield was terminated in April, 2017 Byrne stepped up his efforts to cause Blazer to be fired because of her sex and in retaliation for complaining to Cohen about him attempting to take over her Web Department because of her sex. For example, Byrne and Stitt concealed multiple new and used units at Stitt's Sevierville store from Blazer by not entering the units into the electronic inventory. This prevented Blazer from knowing they were at the remote location, so that she would not know to write up the summaries and take the pictures necessary to upload the units onto the website. Byrne and Stitt then sent the list of units not on the website to Cohen and blamed Blazer for not doing her job. As another

example, Byrne intentionally did not characterize leads that came from the website and/or social media as internet sales to make it look like Blazer's internet marketing was not effective.

36.    On or about May 20, 2017, Byrne hired two male salesmen Ryan Miller ("Miller") and Rick Raffiani ("Raffiani") who were friends from his previous employment. By misrepresenting Blazer's performance, and without Blazer's knowledge, Byrne persuaded Cohen in late May 2017 to make Byrne solely responsible for distributing the internet leads and to take away Blazer's 4% commission. Byrne also persuaded Cohen that Blazer should report to him. Byrne, in turn, gave all the internet leads to Miller and Raffiani to the exclusion of Sanz and the other salesmen. Less than ten days after Miller and Raffiani received their first internet leads, on June 1, 2017, Buddy Gregg terminated Spires for "lack of work" without notifying Blazer, who was Spires' direct supervisor.

37.    On June 2, 2017, Blazer sent local HR representative Forbes a text advising him that Spires felt she had been terminated for complaining about Hollifield's sexual harassment to Forbes and corporate and that Blazer felt her fate would be the same as Spires.

38.    On June 13, 2017, Blazer emailed Forbes reiterating her concern that because she and Spires had reported Hollifield's out-of-control conduct to corporate in January 2017, Spires had been terminated in retaliation for her report, and Blazer felt she was next. Blazer said she had hoped that after reporting Hollifield in January, the degrading sexual remarks in front of her and/or about her and other female employees would stop. But they had continued. Blazer complained about the openly hostile work environment that hadn't changed despite Hollifield's termination. She also reported that she had been the brunt of ongoing false rumors that she had been having "affairs" and "sex" with multiple other male employees.

39.     As examples of the ongoing harassment, Blazer related the two sexually-harassing remarks Byrne had made as recently as May 2017 about another man's wife with "great fake tits," a female customer with "fake tits," and about buying his two previous wives a "pair," which led to his two divorces.  As a result, on June 13, 2017, HR manager Porche (by telephone) and Forbes (in person) spoke to Blazer.  Porche said that she was "concerned" about Blazer's complaints, and that "no one should have to work in that environment," or words to that effect. She promised to conduct sexual harassment training and said that Byrne could not retaliate against her.  Upon information and belief, Porche informed Byrne about Blazer's complaints, Byrne was never disciplined and Buddy Gregg did not perform any sexual harassment training.

40.     On or about June 19, 2017, Byrne hired a male employee to replace Blazer and absorb her duties.  On June 21, 2017, Buddy Gregg terminated Blazer for "failure to follow defined processes, resulting in loss [sic] revenue for the Company."  Buddy Gregg issued Blazer's separation notice, which stated "Job position was eliminated."  These conflicting reasons articulated by Buddy Gregg were phony and pretextual.  Blazer did not "fail to follow defined processes" and her job was not "eliminated," she was replaced by a far less-qualified male employee who took over her duties.  Soon after Blazer was terminated, her replacement told Sanz that he had no idea about what he was doing regarding posting the new and used RVs and motor homes on the Buddy Gregg website.

41.     Buddy Gregg terminated Blazer because of her gender, and in retaliation for her complaints about sex discrimination (to Cohen) and sexual harassment and retaliation (to Porche and Forbes).

13

## Erica Spires

42.     Hollifield hired Spires as Buddy Gregg's receptionist in April 2015.  He told her at the time she was overqualified for the position, but that she would be assigned additional responsibilities.  Spires starting hourly rate was only $15 per hour, but Hollifield promised her that she would receive a raise on her first anniversary.  In addition to her receptionist duties, Spires soon became Hollifield's executive assistant and the *de facto* office manager.

43.     Spires went on a maternity leave with medical complications on or about November 22, 2015 and returned to work on February 2, 2016.  Hollifield openly expressed his unhappiness with Spires pregnancy and maternity leave on a number of occasions.  After she returned from maternity leave, Spires had multiple gynecological appointments.  She also had to ask for time off to take her child to the doctor.  On one occasion, Hollifield told Spires she had taken enough "who ha" days off to average out to about one a week.  He was gesturing toward Spires' private area, and was referring to her maternity leave, doctor's appointments related to childbirth complications and female issues, and her time off for her child's doctor's appointments.

44.     In February 2016, shortly after Spires returned from maternity leave and while she was still nursing, Hollifield coerced Spires and Blazer to ride around with him during the work day while he drank beer.  Over Spires' objection, Hollifield coerced her into drinking two large "stovepipe" cans of beer which he had purchased and told her if she did not drink them she would never be "part of the team."  Spires felt compelled to comply.  During this drive, Hollifield stopped the vehicle, opened the door and urinated publicly right next to the vehicle in front of Spires and Blazer.  Plaintiffs Spires and Blazer were disgusted.

14

45.    In mid-March 2016, Spires went to her gynecologist for a checkup.  The following morning, Hollifield asked her if she "got the all clear," and if she let her husband "test it out" last night, referring to being cleared for sexual activity.

46.    In approximately the summer of 2016, Spires asked off for a doctor's appointment. Hollifield said, "You aren't pregnant, are you?"  When Spires replied, "no," Hollifield said, "Good, that would be bad . . . for you."

47.    Aside from complaints to Spires about her time off related to her pregnancy, childbirth, and follow-up medical appointments, Hollifield discriminated against Spires because of her sex by denying her the raise he had promised her when she was hired. Hollifield did not give Spires the promised raise at the point of her one-year anniversary in April 2016.  By June 2016, it became clear to Spires that Hollifield was not going to give her the promised raise even though her duties had expanded dramatically from the receptionist position.

48.    In June 2016, Spires asked Hollifield about her raise.  Hollifield said she had "not been there a year" because "you were out for "three (3) months having your kid."  Spires responded that she had only been out nine (9) weeks and even if he took that off, she had been there a year. Hollifield responded, "no, it's after year and your time started over after you came back from maternity leave."  Hollifield never gave Spires the promised raise because of her sex and maternity leave.

49.    Hollifield also sexually harassed Spires in a manner similar to Blazer.  He frequently referred to both Blazer and Spires as "Tits."  In Spires' presence, he also referred to Blazer and another female (warranty clerk) as "Fancy Pants" on almost a daily basis.  Once in May 2016, with his office full of male sales people, he told Spires to have Blazer come to his office, first referring to her as "Tits . . . I mean Lauren."

15

50.     On one occasion, Hollifield told Spires she had "nice tits" which he preferred them because they were "natural."

51.     Spires had hoped her January 25, 2017 complaint about sexual harassment against herself, Blazer, and other females would stop the harassment.  It most certainly did not.  Jerry Byrne made multiple sexual comments either to Plaintiffs Spires and Blazer, or in the office loud enough for both Spires and Blazer to hear. For example, because of her computer experience, Spires frequently helped other employees in the sales department with their computer issues.  This, in turn, required her to lean over their desks.  Byrne frequently commented, "Erica, every time I see you, you are laying across a desk."

52.     On one occasion, after Spires January 25, 2017, complaint, she was on the lot with Byrne when an attractive female customer got out of a golf cart in front of Byrne.  Byrne commented to Spires that this customer had "carpet the same color as the drapes."

53.     On May 15, 2017, Spires heard Byrne talking to Whitehead loudly telling Whitehead how getting his wife "fake boobs were the quickest way to a divorce." Byrne went on to elaborate on his personal experience with buying "fake boobs" for two wives which lead to two divorces.  On May 17, 2017, Byrne, Blazer and Spires were outside the office talking when a male salesman approached them. He had a couple (male and female) in a nearby motor coach and said he had them here for delivery of a coach and was waiting for finance.  Byrne remarked, "Oh yeah, I saw those fake tits coming off the golf cart, I should have known it was her," or words to that effect.

54.     Spires was disgusted at Byrne's misogynistic attitude, but since nothing had changed after her first complaint except that she was transferred to a job without defined and insufficient duties, she did not complain again.

16

55. On one occasion prior to March 2017, Byrne pressured Spires into changing an MSPR sheet by raising the manufacturers retail price. It was approximately 4:50 p.m. and Spires had to leave at 5:00 p.m. to pick up her child. Byrne told Spires that she could not leave for the day until she modified the MSPR sheet. She complied. The next day Spires asked Byrne why he wanted to raise the manufacturers retail price. Byrne explained that the lender would only loan 110% above the MSRP value. Spires became upset and told Byrne that he had used his position to force her to do something illegal. Byrne replied, "that's business hon, it ain't going to work if you're squeamish about stuff like that."

56. On March 22, 2017, Byrne tried to pressure Spires into changing the earnings, withholdings and dates on a customer's pay stub (which was over a year old) because of her computer skills with Photoshop. She repeatedly declined, telling Byrne that was fraud, but Byrne kept pushing her saying it was "no big deal." Byrne said she should trust him, he'd been "doing this stuff for over 30 years and knew how not to get caught." Spires was able to leave work that day without falsifying the pay stub. On March 23, 2017, Byrne continued to try to coerce Spires into using Photoshop to fraudulently modify the check stub to obtain financing on the deal. Spires reported Byrne's demand to Blazer, who emphatically told Spires she could not change the check stubs. Spires finally told Byrne that she would not do it because she did not want to get involved in fraud.

57. On May 24, 2017, Byrne met with Spires, who was working that day while having a migraine headache, and Blazer. Byrne asked Spires to return to her former administrative duties, including handling title work. Spires was willing to help the Company, but asked Byrne for a job description so that she would know what her duties would be. Spires had already been transferred to the Web Department without defined duties where she frequently had to seek out work to stay

17

busy. Spires was also concerned that by directly reporting to Byrne, she would again be pressured to engage in fraud by falsifying various paperwork necessary to obtain financing. In response to Spires' request for a job description, Byrne scribbled three words on a piece of paper and gave it to Spires. Spires said that was not a job description and renewed her request. The meeting ended with Spires in tears and agreeing to the proposed transfer.

58.     The following day, May 25, 2017, Spires asked to meet with Byrne again both to explain that she had a migraine the previous day and to further discuss the transfer. Byrne said he wanted to meet with Spires alone but relented when she asked for Blazer to be present. Spires again asked for a job description and Byrne told her she was "overthinking this." When it became clear that Spires was reluctant to go back to doing the administrative work under Byrne's supervision, he told Spires that she didn't have to move, that she could stay in the Web Department. Spires said that if it was okay she would stay where she was. Byrne said "fine."

59.     At no time did Byrne tell Spires or Blazer that Spires position was going to be "eliminated" a mere three days later.

60.     On June 1, 2017, Forbes (in person) and Porche (by phone) informed Spires that her job was being "eliminated." The decision was made without consulting or informing her supervisor, Blazer, before Spires had been terminated.

61.     In October 2017, upon information and belief, Buddy Gregg posted a position for a "web assistant," the same position it claimed to have "eliminated" when it fired Spires.

62.     Buddy Gregg's stated reason, that Spires' position was eliminated, was false and a pretext to cover up the real reasons for her termination. Byrne ordered or recommended Spires' termination because of her sex and her complaint about sexual harassment.

**David Sanz**

63.     Buddy Gregg hired Sanz on August 24, 2015, as a retail associate.

64.     At the time of hire, Hollifield memorialized the terms of Buddy Gregg's draw against commissions contract with Sanz.  Sanz was to be paid a draw of $750 per week against a commission of 20% of the profit on each sale.  Sanz wrote a clarification on the contract before he and Hollifield signed it, stating that "sales price less cost of goods equals profit."  He was also to receive "spiffs" which were discretionary bonuses on sales with a low profit margin and bonuses based upon sales of old age units and sales of finance and warranties.  Sanz and Hollifield both signed the commission agreement.

65.     In 2015 and 2016, Buddy Gregg used an "up" system (i.e., next man up) to give the salesmen rotating opportunities at customer calls, walk-ins and internet leads.  When Sanz had a fair access to prospective customers he was one of Buddy Gregg's most successful salesmen. He was salesman of the month seven times, including October 2015, November 2015, February 2016, March 2016, July 2016, August 2016 and January 2017.  The January 2017 salesman of the month award was primarily based upon leads which Sanz received prior to his January 25, 2017, complaint to Cohen and Forbes about Hollifield's sexual and racially harassing conduct.

66.     Sanz observed that the work environment at Buddy Gregg was, and is, permeated with sexually harassing behavior and conduct. On multiple occasions, Sanz heard Hollifield refer two female employees, Plaintiffs Blazer and Spires, as "tits."  He also referred to Blazer and another female (warranty clerk) as "Sweet Cheeks."  He was present during part of Hollifield's October 25, 2016 sales department meeting where, with Blazer and Spires present in a room full of men, he launched into a profanity-laced sex-based tirade, which included references to "blow jobs," "cocksuckers," being "fucked," and "suck my dick."  It was an uncomfortable experience

19

for Sanz, but even more uncomfortable for Blazer and Spires. Sanz recognized that Hollifield was drunk (as he usually was by mid-afternoon) and left the meeting.

67. The environment at Buddy Gregg was also rife with racial discrimination, which Sanz consistently opposed. Mr. Hollifield expressed his bias against African-Americans openly and often, specifically by calling them "niggers." One of Hollifield's routine comments regarding African-American customers was that, "niggers don't buy motor coaches." Hollifield also ridiculed salespersons for wasting their time (in his opinion) waiting on African-American customers. Due to Hollifield's attitude, most salespeople refused to assist African-American customers, and Sanz was one of the few salesmen who would take the African-American customers who were walk-ins. Sanz was disgusted with Hollifield's manifest racial bias and admonished Hollifield to stop on a number of occasions. His objections were ignored.

68. On January 18, 2017, Sanz was checking on the repairs to a motor coach Sanz had recently sold to an African-American female customer. The motor coach had a broken ladder with damaged fiberglass at the bottom. As part of the deal, Sanz assured the customer that Buddy Gregg would repair the fiberglass and put on a new ladder so that it would look as good as new. Given Hollifield's discriminatory attitude toward African Americans, Sanz wanted to ensure the customer was treated fairly. Sanz checked the repair on January 18 before sending the coach out. What he found was appalling. Instead of repairing the broken fiberglass and putting on a new ladder, the body shop had covered up the fiberglass with thin sheet metal and attached a used ladder back to it. It was obviously not what Sanz had promised to the customer, and the repair would not hold up under any use of the ladder. Moreover, Sanz was confident that this type of repair job would not have been performed on a white customer's coach.

69.     Sanz immediately went to Hollifield's office and asked him to come see the repair to his customer's coach.  Hollifield said, "I took care of it."  Sanz told him that he (Sanz) had just seen it and it had not been taken care of.  Hollifield replied that it was "fine."  After some back and forth, Sanz finally recognized that Hollifield was drunk (as he usually was at that time of day) and did not plan to remedy this shoddy repair.  He turned to go toward his office and Hollifield chased him down the hall, yelling at Sanz, "You can't talk to me like that," or words to that effect.  Hollifield grabbed Sanz by the shoulders from behind and when Sanz turned, Hollifield shoved him roughly up against the wall and screamed "I'm not afraid of you," or words to that effect.  Sanz was shocked and upset by his boss's physical attack on him.  At that point, Sanz raised his voice as loud as Hollifield was addressing him, and said something like, "Now, you've assaulted me."  Sanz told him he would call the cops, which made Hollifield even angrier.  Hollifield said he would fire Sanz.

70.     Sanz went to his office and started to dial 911.  Hollifield chased him into the office and slammed the door.  Hollifield was physically threatening, and as Sanz was dialing 911 he grabbed the phone to prevent him from making the call.  Hollifield told Sanz again that he would fire him if he called 911.  Sanz then said that he was calling corporate to report him, and Hollifield physically kept him from doing that as well.  Finally, Hollifield left Sanz's office.

71.     Later that afternoon, after Hollifield cooled off and apparently sobered up, he asked Sanz to ride with him in the golf cart up to look at Sanz's customer's coach.  On the way, Hollifield said that Sanz's customer was a "big ass nigger" and the ladder would not support her anyway, or words to that effect.  Sanz told Hollifield that he needed to address his serious alcohol problem.  Sanz also confronted Hollifield about his racial bias and use of the word "nigger," which Sanz believed was a major factor in his approval of the shoddy work on Sanz's customer's motor coach.

21

72.     The next day, January 19, 2017, Sanz reported Hollifield's physical assault to the manager of Buddy Gregg's Sevierville store manager, Stitt.  Stitt told Sanz that he needed to report the incident to corporate, and Stitt dialed James Glasgow, one of the Company's owners.  Sanz told Glasgow what had happened.  Glasgow thanked Sanz and said he would "take care of it."

73.     On or about January 25, 2017, Cohen and Glasgow flew to Knoxville.  Toward the end of the day, Sanz was called into a meeting with Cohen and Forbes.  Cohen started out as if the assault incident was Sanz's fault.  He asked Sanz if he considered what he did during the January 18 incident as being insubordinate.  Sanz explained that he only raised his voice after he had been physically assaulted to draw attention to Hollifield' conduct.  Sanz said that Hollifield was drunk and out of control.  Sanz reported that there were numerous problems at the dealership, including Hollifield's sexual harassment of female employees, his racial discrimination of customers and employees, and financial improprieties and kickbacks, among other things.  Sanz described the sales department meeting back in October 2016 where Hollifield uttered the sex-based slurs in front of Blazer and Spires.  Sanz said that Hollifield's conduct that day was way out of line, and the females were highly offended.

74.     Sanz reported to Cohen and Forbes that Hollifield was blatantly racially discriminatory toward African American employees and customers.  He related Hollifield's chronic use of the word "nigger" and his frequent comment that "niggers don't buy motor coaches."

75.     The discrimination and harassment at Buddy Gregg was not limited to gender and race.  Indeed, Hollifield disliked "Jews" and consistently made anti-Semitic comments.  This was particularly upsetting to Sanz because he is a Messianic Jew.

76.     Sanz had hoped that raising these concerns first to Hollifield and then to Buddy Gregg's corporate officials would put an end to the unlawful discrimination and harassment. He was sorely mistaken. An African-American employee (mechanic), was frequently referred to as a "nigger" and a banana was placed in his work area. He finally quit in 2017.

77.     The sex based hostile work environment continued unabated.

78.     Hollifield was terminated in April 2017. Upon information and belief, Buddy Gregg never disciplined Hollifield for his sex--and-race-based discriminatory and harassing behavior, or even gave him as much as a written warning.

79.     Hollifield's replacement, Byrne, continued the discriminatory work environment. Sanz learned from Blazer and Spires that Byrne had made comments about "fake tits" including a particular customer's "fake tits," in their presence. Byrne also continued Hollifield's mantra that "niggers don't buy coaches," and constantly used the term "Jew" in a derogatory fashion. Despite Hollifield's termination, nothing had changed at Buddy Gregg.

80.     Immediately after Sanz's January 2017 complaints to Hollifield, Glasgow, Cohen, and Forbes, Sanz began experiencing a significant reduction in his phone, walk-in, and internet leads. For an extended period after Sanz's protected activity, most of the phone calls from potential customers that were routed to Sanz only rang once or twice, and when he picked up the phone, there was no one there. Sanz complained about the phone to no avail. Upon information and belief, those calls were intentionally rerouted to other salesmen.

81.     Shortly after January 25, 2017, Hollifield and Byrne took control of the assignment of almost all the walk-ins and of most internet referrals. Thereafter and until his termination, Sanz received very few walk-ins, call-ins, and internet leads as compared to the other salesmen.

82. In late May 2017, Byrne hired two friends from his prior employment, Miller and Raffiani. Thereafter, Byrne assigned virtually all internet leads to Miller and Raffiani, and the scant internet leads Sanz had been receiving stopped altogether. Shortly after January 25, 2017, and for a number of months thereafter, Sanz was unable to get on his computer because, according to the pop-up notice, Buddy Gregg had insufficient licenses. Other salesmen seemed to be able to log on, whereas Sanz could not. He repeated complained about the lack of computer access to no avail. Without access to his computer, Sanz had to conduct business almost entirely through his smart phone.

83. Sanz was also told repeatedly by multiple employees who had been in the management meetings held by Hollifield and Byrne, that he had a "target on his back" and to "watch your back," because they are "trying to get rid of you."

84. The net result of these combined actions dramatically limited Sanz's access to potential customers and essentially dramatically reduced his sales. For the six-month period from January 1, 2016 through June 16, 2016, when Sanz had access to leads, he made 31 sales. For the same period during 2017, with his leads choked off, Sanz made only 18 sales. The difference in sales volume was approximately $725,000.

85. In order to generate his own leads, in May and June 2017, Sanz ran ads on Craigslist, at his own expense. He sold one unit almost immediately. In all, Sanz was able to sell five motor coaches from his Craigslist ads. However, when Byrne found out in July 2017 that Sanz was placing the ads, he told Sanz to stop because it would interfere with Miller and Raffiani who had been routinely placing ads on Craigslist since they were employed. It became increasingly clear that Byrne's on-going retaliation for Sanz's complaints to corporate officials was intended to either starve Sanz out or allow Byrne to terminate him for poor sales.

24

86.     On July 12, 2017, Sanz hand-delivered a complaint to Forbes outlining the sexual, racial and religious harassment and discrimination set forth above and the retaliation he was enduring.  He also e-mailed it to the corporate HR Manager Porche.  His retaliation complaint went unaddressed. Indeed, in a direct violation of Buddy Gregg's Harassment Policy, no one from Human Resources or any other Company official ever met with him to address his complaint.

87.     By September 20, 2017, because he had received no response from Porche, Forbes or anyone else, Sanz sent a second email to Porche stating that he had not heard back from her regarding his complaint of retaliation. Sanz requested a meeting with Porche and offered to come to corporate headquarters on his day off to discuss the ongoing retaliation.  He stated that he loved his job, but he continued to have to deal with (previously reported) issues that the Company is either unaware of or had not had the opportunity to address.  Again, in violation of Buddy Gregg's Harassment Policy, Porche did not even bother to respond and the retaliation continued.

88.     By the summer of 2017, Sanz had been informed by four present or former Buddy Gregg employees, including Blazer, Spires, Justin Whitehead and Ron Augustad, that Randy Thomas, a salesman, who upon information and belief was promoted to inventory manager, was slandering Sanz by telling numerous employees that Sanz was a "crook," that he had "stolen ten million dollars in Florida," that he was a "liar" and similar statements.  Thomas' statements about Sanz were false, malicious and were made as part of Buddy Gregg's effort to force Sanz to quit. Sanz complained repeatedly to Byrne about Thomas' conduct after Byrne replaced Hollifield in April 2017.  Byrne did not investigate, although there were multiple witnesses to Thomas' conduct, and declined to do anything about it.  Sanz learned that Thomas was continuing to spread his false and malicious claims.

89.     On or about September 20, 2017, Sanz approached Thomas in an attempt to stop the slanderous and malicious statements that Thomas was making about him. He told Thomas he had been made aware of what Thomas was saying about him to other employees and asked him to stop. Sanz asked if they could just move forward and put this behind them. Thomas at first denied the statements and asked Sanz who told him. Sanz replied that several employees, including a former sales associate, Ron Augustad, had informed Sanz about the slander. Thomas claimed Augustad "is going to recount that." Sanz told Thomas that he had recorded Augustad's statement and played it for Thomas. Thomas became angry and told Sanz, "if you have a case, sue me," or words to that effect. Sanz responded that he had an attorney and would consider it.

90.     Rather than allow Sanz to come to headquarters to explain the facts surrounding the unlawful retaliation, Buddy Gregg, through Byrne, retaliated against him again. On September 29, 2017, Byrne gave Sanz and Thomas a memo setting his "expectation" that neither of them was to engage in rumors or gossip about others or start or escalate a conflict with another employee. Sanz was stunned that he was being written up for asking Tomas to quit slandering him. Sanz explained to Byrne that he understood the memo but asked why he was being asked to sign the document when he was the victim of Thomas' false and slanderous statements about Sanz. Byrne asked Sanz who could confirm the slander, and Sanz said several former employees, including Ron Augustad. Byrne said he understood that Sanz had recorded his conversation with Augustad, and he wished that Sanz had not done that. Sanz explained that he recorded the conversation because it was on the day Augustad had been fired and Byrne had instructed Sanz to listen carefully to what Augustad said as Sanz was driving him home. Byrne again asked Sanz to sign the memo and Sanz declined, saying that he was the victim of Thomas' slander campaign and

not the perpetrator. Byrne did not mention any conflicts with other employees or customers at the meeting.

91.     Sanz was terminated on October 13, 2017. Byrne conducted the termination meeting, and Stitt was also present. Byrne told Sanz that he was being terminated due to a "reorganization." However, his Buddy Gregg Employee Termination Form states that the reason was "ability to form positive relations with other employees and or customers." Both reasons are false and a pretext to cover up Buddy Gregg's retaliatory motive.

92.     On or about December 18, 2017, Sanz accepted a position and began working at Tennessee RV Supercenter as a sales associate. Sanz was a successful salesman and performed his duties at Tennessee RV Supercenter in a satisfactory manner. In March 2018, a Buddy Gregg representative encouraged Tennessee RV Supercenter to terminate Sanz's employment in retaliation for Sanz filing the instant lawsuit. As a result of Buddy Gregg's unlawful retaliation and intentional interference with Sanz's business relations, Tennessee RV Supercenter terminated Sanz's employment on March 20, 2018.

## CAUSES OF ACTION

### COUNT I – ILLEGAL DISCRIMINATION AND RETALIATION: STATUTORY VIOLATIONS AND DAMAGES

93.     Plaintiffs reallege and incorporate Paragraphs 1 through 92 of the Complaint.

94.     Title VII and the THRA prohibit an employer from discrimination against an employee on the basis of sex with respect to compensation, terms, conditions or privilege of employment.

95.     Title VII and the THRA prohibit an employer from discriminating against an employee because he or she opposed any practice made as an unlawful employment practice.

27

96.     Buddy Gregg discriminated against Blazer and Spires because of their sex (female) by, *inter alia,* subjecting them to disparate treatment: permitting a work environment to exist at Defendant's facility that was offensive and hostile to female employees, including Blazer and Spires, and taking little if any corrective action when Spires complained about it; and terminating their employment, refusing to give Spires a promised raise; taking adverse action against Spires because of her maternity leave and need to care for minor children; transferring Spires to a position in the Web Department with undefined and insufficient responsibilities, and then eliminating her position; attempting to, and finally succeeding, in taking away Blazer's Web Department by misstating her performance; and eliminating her 4% commission and terminating their employment. Buddy Gregg's actions described above constitute discrimination on the basis of sex in violation of Title VII.

97.     Buddy Gregg discriminated against Blazer, Spires, and Sanz for opposing its unlawful employment practices, including its hostile work environment on the basis of sex (female). Buddy Gregg also discriminated against Sanz for opposing its racially discriminatory practices and racially-biased hostile work environment. Buddy Gregg also discriminated against Blazer, Spires, and Sanz for complaining about unlawful retaliation by, *inter alia*:

A.     removing Spires from her receptionist and *de facto* office manager position, leaving her without assigned duties for several weeks, transferring her to a position in the Web Department with undefined and insufficient responsibilities and then terminating her;

B.     engaging in efforts to understate Blazer's performance and the performance of her Web Department, hiding inventory at the Sevierville store and then blaming Blazer for failing to have uploaded the hidden inventory in the website, removing Blazer from many of her responsibilities as the Web Manager, eliminating her 4% commission, and terminating

28

her employment right after she complained of a hostile work environment and retaliation; and

        C.        reducing Sanz's access to leads, interfering with his ability to use his business phone and computer, refusing to allow Sanz to advertise on the internet, while allowing other salesmen to do so, loading Sanz's deals with bogus costs and other charges to reduce the profit on his sales, miscalculating and delaying his commissions, refusing to pay his commissions, terminating his employment, and interfering with and causing his employment with Tennessee RV Supercenter to be terminated.

## COUNT II – BREACH OF CONTRACT

98.     Plaintiff Sanz realleges and incorporates paragraphs 1 through 97 of the Complaint.

99.     Buddy Gregg entered into a contract to pay Sanz a draw of $750 per week against commissions paid at the rate of 20% of the profit on the sale of each unit. The contract, signed by Sanz and Hollifield, defined the profits to mean sales price less cost of the unit sold.

100.    Buddy Gregg materially breached its contract with Sanz through a number of schemes which resulted in bogus costs and/or other charges being deducted from the sales price or added to the cost of the motor homes so as to significantly reduce Sanz's commissions and by refusing to provide Sanz the records to support the bogus charges.

101.    As a result of Buddy Gregg's breach of contract with Sanz, Sanz has suffered damages, including, but not limited to unpaid income from commissions and arbitrarily reduced spiffs.

## COUNT III – VIOLATION OF THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING

102.    Sanz realleges and incorporates paragraphs 1 through 101 of the Complaint.

29

103.    Sanz had a contract with Buddy Gregg to be paid a 20% commission on the profit of each unit sold.  Profit was defined as sales price less cost of the units sold.

104.    The contract between Sanz and Buddy Gregg contained an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.

105.    Buddy Gregg violated the implied covenant of good faith and fair dealing through a number of schemes which resulted in bogus costs being added to the units sold, or other charges being deducted from the sales price or added to the cost of the units sold so as to significantly reduce the commissions owed to Sanz.

106.    Sanz suffered damages in the form of unpaid income from commissions as a result of Buddy Gregg's violation of the implied covenant of good faith and fair dealing in Sanz's commission contract with Buddy Gregg.

## COUNT IV – PROMISSORY ESTOPPEL

107.    Sanz realleges and incorporates paragraphs 1 through 106 of the Complaint.

108.    Buddy Gregg engaged in a number of schemes to increase the costs of the units sold or otherwise to decrease the actual profit on units sold by Sanz, and then refused to provide him with records to support the bogus charges.

109.    Buddy Gregg made unambiguous and enforceable promises to Sanz to pay him a 20% commission on the profit from the sale of each unit.  Profit was defined as the sales price less cost of the unit sold.

110.    Sanz reasonably relied upon the promises made by the Defendant to his detriment.

111.    Sanz has suffered damages in the form of unpaid commissions as a result of his reasonable reliance and detrimental reliance.

30

## COUNT V – UNJUST ENRICHMENT

112.     Sanz realleges and incorporates paragraphs 1 through 111 of the Complaint.

113.     Sanz conferred a benefit upon Buddy Gregg by securing millions of dollars' worth of sales and profits.

114.     By failing to pay Sanz the promised compensation for his services through various schemes to reduce the profit, the benefit granted to Buddy Gregg is unjust and was accepted under circumstances that would make it inequitable for Buddy Gregg to retain the benefit without paying Sanz the value thereof.

## COUNT VI– INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS

115.     Sanz realleges and incorporates paragraphs 1 through 114 of the Complaint.

116.     From December 18, 2017 until March 20, 2018, Sanz was employed at Tennessee RV Supercenter as a sales associate.

117.     Sanz was working under a contract of employment with Tennessee RV Supercenter.

118.     Buddy Gregg had knowledge that Sanz had a contract of employment with Tennessee RV Supercenter.

119.     In March 2018, Buddy Gregg, through one or more of its representatives, advised Tennessee RV Supercenter that Sanz had filed this Title VII lawsuit against Buddy Gregg.  Buddy Gregg's representative(s) further defamed Sanz in the conversation(s) with representative(s) of Tennessee RV Supercenter.

120.     Buddy Gregg intended to procure Sanz's termination and intentionally interfered with Sanz's business relations with Tennessee RV Supercenter.

121.    Buddy Gregg's intentional interference with Sanz's business relations caused Tennessee RV Supercenter to abruptly terminate Sanz on March 20, 2018.

122.    Buddy Gregg used improper means to interfere with Sanz's business relations with Tennessee RV Supercenter by unlawfully retaliating against Sanz for maintaining the instant lawsuit against Buddy Gregg.

123.    Buddy Gregg acted with an improper motive to interfere with Sanz's business relations with Tennessee RV Supercenter by retaliating against Sanz for maintaining the instant lawsuit against Buddy Gregg

124.    Buddy Gregg further used improper means to interfere with Sanz's business relations with Tennessee RV Supercenter by making false and defamatory remarks about Sanz.

125.    As a result of Buddy Gregg's intentional interference with his business relations, Sanz has lost, and continues to lose, tangible job benefits including but not limited to commission payments, health insurance and related benefits.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Blazer, Spires and Sanz pray this Court for the following relief:

A.      Enter a judgment in Plaintiffs Blazer's and Spires's favor and against Defendant Buddy Gregg for discrimination on the basis of sex in violation of Title VII of the Civil Rights Action of 1964, 42 U.S.C. § 2000e-2 *et seq.* and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-401.

B.      Enter a judgment in Plaintiffs' favor and against Defendant Buddy Gregg for unlawful retaliation from Plaintiffs' protected activities in violation of Title VII of the Civil Rights Action of 1964, 42 U.S.C. § 2000e-3 *et seq.* and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-301.

32

C.     Enter a judgment in Plaintiff Sanz's favor and against Defendant Buddy Gregg for breach of contract;

D.     Enter a judgment in Plaintiff Sanz's favor and against Defendant Buddy Gregg for violation of the implied covenant of good faith and fair dealing in Sanz's commission contract;

E.     Enter a judgment in Plaintiff Sanz's favor and against Defendant Buddy Gregg for promissory estoppel;

F.     Enter a judgment in Plaintiff Sanz's favor and against Defendant Buddy Gregg for unjust enrichment;

G.     Enter a judgment in Plaintiff Sanz's favor and against Buddy Gregg for intentional interference with business relations.

H.     Issue a mandatory injunction ordering the Defendant Buddy Gregg to refrain from unlawful discrimination and retaliation and ordering Defendant to undertake and rectify any and all Title VII violations and /or inequities, and for Defendant's entire sales department to undergo appropriate diversity and Title VII/THRA discrimination, harassment and retaliation training;

I.     Award Plaintiffs back pay in an amount necessary to make each whole for the unlawful actions taken against them;

J.     Award Plaintiffs front pay to the extent permitted by law;

K.     Award Plaintiffs compensatory and consequential damages in an amount to be proven at trial for emotional pain and suffering, humiliation, damage to career, loss of enjoyment of life to the extent permitted by law;

L.     Award Plaintiffs punitive damages to the extent permitted by law;

33

M.    Award Plaintiff Sanz monetary damages from Defendant Buddy Gregg for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and unjust enrichment;

N.    A jury to try this cause;

O.    That Plaintiffs be awarded their reasonable attorney fees, litigation expenses, costs, and pre- and post- judgment interest; and

P.    Grant such other and further general as this Honorable Court deems just and appropriate.

Respectfully submitted this 5th day of April, 2018.

/s/ Edward G. Phillips
Edward G. Phillips (BPR #006147)
Brandon L. Morrow (BPR #031242)
**KRAMER RAYSON LLP**
Post Office Box 629
Knoxville, TN 37901-0629
865.525.5134
ephillips@kramer-rayson.com
bmorrow@kramer-rayson.com

Attorneys for Plaintiffs

34

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of April 2018, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. The following parties will be served by regular U.S. mail. Parties may gain access to this filing through the Court's electronic filing system.

> Howard B. Jackson, Esq.
> Wimberly Lawson Wright Daves & Jones, PLLC
> 550 Main Avenue, Ste 900
> Post Office Box 2231
> Knoxville TN  37901-2231

> /s/ Edward G. Phillips
> Edward G. Phillips (BPR #006147)