UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| LAUREN BLAZER, ERICA SPIRES, and, DAVID SANZ  )<br>)<br>Plaintiffs,  )<br>)<br>v.  )<br>)<br>BUDDY GREGG MOTOR HOMES, LLC,  )<br>)<br>Defendant.  ) | No. 3:18-CV-00097<br><br>JUDGE: Greer<br>MAGISTRATE: Guyton |

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7, Buddy Gregg Motor Homes, LLC ("Buddy Gregg"), by undersigned counsel, submits this statement of undisputed facts in support of its motion for summary judgment[1].

1. Buddy Gregg hired Spires as a Receptionist on April 17, 2015.  (Spires Dep. 27.)

2. At a meeting in January of 2017, Company President Brad Cohen ("Cohen") told her that she was being promoted to the web sales department pending an interview with Internet Sales Manager and Spires' friend Lauren Blazer.  (Spires Dep. 79.)

3. Spires began the Web Assistant position in about March of 2017.  (Spires Dep. 90-91.)

4. On May 24, 2017, Sales Manager Jerry Byrne ("Byrne") offered Spires a position doing tag and title work.  (Spires Dep. 94; Byrne Aff. ¶ 3.)

5. Spires declined the tag and title position.  (Spires Dep. 98; Byrne Aff. ¶ 3.)

---

[1] Buddy Gregg submitted its motion earlier.  To the extent submission of this document later request additional work for counsel for Plaintiff Buddy Gregg notes that it does not oppose a reasonable extension of time for Plaintiff's response.

1

6. Former manager Travis Hollifield ("Hollifield) referred to Spires' taking days off for her newborn son and her own follow-up medical appointments as "hoo ha" days. (Spires Dep. 41.)

7. Hollifield often made comments about females' breasts. (Spires Dep. 44.)

8. Hollifield once told Spires that she had nice breasts, and that he liked hers because he preferred natural breasts. (Spires Dep. 41.)

9. Hollifield commonly referred to female employees such as Assistant Finance Manager Sandy Johnson or Blazer as "sweet cheeks" or "fancy pants". (Spires Dep. 42-43.)

10. Spires took time off to have an IUD placed and when she returned Hollifield asked her if she had let her husband "test drive" it. (Spires Dep. 43.)

11. On one occasion Hollifield referred to Blazer at "tits", saying to Spires, "Go get tits, I mean Lauren." (Spires Dep. 44.)

12. On an occasion in Hollifield's office when Spires and Blazer were both present Hollifield commented to Blazer that he was fine with her taking time off for breast augmentation surgery but that Blazer had to "show them" to him later. (Spires Dep. 45.)

13. On an occasion a vendor was discussing the sale of t-shirts to Buddy Gregg for its employees to wear. Hollifield commented to the t-shirt salesperson that they would need extra large for the women because they all have large breasts or words to that effect. (Spires Dep. 46-47.)

14. On October 25, 2016 Hollifield became very angry over a conversation he had with a corporate official in Louisiana. He called several persons into a room, including Spires, and went on a profane tirade. Spire's written description of the meeting is Exh. 4. Hollifield commented that he was tired of everyone "f_____g him", that "it would

2

be no different if we were selling blow jobs or condoms", referred to staff as "cocksuckers", and said he was going to tell a vendor to "suck his dick." (Exh. 4.)

15. There were several males in the room in addition to Spires and Blazer. (Exh. 4.)

16. It was apparent that Hollifield was quite angry as his voice was raised, and his comments were directed to everyone in the room not just one or two people. (Spires Dep. 50-51.)

17. At or around the time she was hired Hollifield said Spires would receive a raise in a year. (Spires Dep. 56.)

18. A few months after Spires returned from maternity leave in about June of 2016 she inquired about the raise. (Spires Dep. 57.)

19. In response to Spires' inquiry over the raise Hollifield said the one year started over since she went on leave. (Spires Dep. 58.)

20. On one occasion in February of 2016 Hollifield invited Spires to ride around in a vehicle with he and Blazer. (Spires Dep. 115-16.) The three of them rode around and Hollifield bought some beer. He insisted that Spires have some, which she did. (Spires Dep. 118.)

21. She believes Hollifield's thought was that if he took others with him and they also drank that they could not "tell on him." (Spires Dep. 118.)

22. While on the drive mentioned in statement 21 Hollifield stopped, opened the door and with his back to Blazer and Spires and urinated on the ground. (Spires Dep. 117.)

23. Hollifield drank beer and urinated beside the car in front of males also. (Stitt Aff. ¶ 4.)

24. Hollifield did not touch Spires inappropriately or make a sexual advance. (Spires Dep. 48.)

25. At some point between March and May of 2017 Spires overhead Byrne telling then Finance Manager Justin Whitehead that he (Whitehead) should not get his wife a "boob job", as doing so was a sure-fire path to divorce. (Spires Dep. 61-62.)

3

26. Byrne had provided such for his previous wife or wives and afterward they "turned into cheating whores" or words to that effect. (Spires Dep. 62.)

27. Byrne and Whitehead were in the hallway or in Whitehead's office; Spires did not see them and was not a participant in the conversation but heard the comments. (Spires Dep. 62.)

28. Byrne once wondered aloud about a female customer whether "the carpet matches the drapes." (Spires Dep. 64.)

29. In about May of 2017 Byrne commented about a female customer that he should have known it was her because of the "fake tits". (Byrne Dep. 66.)

30. Byrne was "difficult to work with and a hothead." (Spires Dep. 68.)

31. Once when Spires was trying to obtain information from a customer Byrne told her she should just take notes and not "overthink it." (Spires Dep. 68.) Spires took that as a sexist comment, that she should just answer the phone and shut up. (Spires Dep. 68.)

32. Spires helped others with their computer issues. Byrne once commented "every time I see you you're laying across a desk." (Spires Dep. 70.)

33. On one occasion salesperson David Colette came back from lunch and had clearly been drinking. He asked Spires to show him her breasts. (Spires Dep. 71-72.)

34. Service Manager Eric Bivens made sexual innuendoes. For example, if Spires said "what's up" when answering the phone Bivens would make some sort of erection joke. (Spires Dep. 73.)

35. Salesperson Darren DeRossett spoke of his girlfriend's grooming habits with respect to her privates. (Spires Dep. 74.)

36. DeRossett spoke of sexual activity with his girlfriend, and he and another salesperson, Ricky Cummins, showed each other pictures of their girlfriends who were apparently in various states of undress. (Spires Dep. 74-75.)

37. DeRosset and Cummins spoke of their girlfriends and pictures to each other in Spires' presence but did not show her the pictures. (Spires Dep. 75.)

38. No one touched Spires inappropriately or made a sexual advance. (Spires Dep. 76.)

39. In the January of 2017 meeting Spires shared Exh. 4, the description of Hollifield's tirade, with Cohen and then Controller Don Forbes. (Spires Dep. 79-80.)

40. Spires explained the events of the October of 2016 meeting to Cohen and Forbes. (Spires Dep. 83.)

41. In the January of 2017 meeting Cohen and Forbes asked Spires whether Hollifield left work and returned appearing to be intoxicated. Spires said "yes, nearly every day." (Spires Dep. 83.)

42. After Spires shared the information Cohen told her that she was protected. (Spires Dep. 84.)

43. Spires was unsure what that meant and Cohen explained that her report was protected activity. (Spires Dep. 85-86.)

44. Cohen told Spires she had done the right thing and that "they would investigate and take care of it." (Spires Dep. 85.)

45. After the January of 2017 meeting Spires did not contact Cohen and express further concerns. (Spires Dep. 86.)

46. In the January meeting Spires did not give Cohen information about inappropriate comments made by persons other than Hollifield. (Spires Dep. 84.)

5

47. During the time that Spires was employed Byrne had no knowledge that she or Blazer had made any allegations about him making sexually inappropriate comments. (Byrne Aff. ¶ 5; Porche Dep. 69-70.)

48. With respect to her work, Spires performed well. (Spires Dep. 99-100.)

49. After Buddy Gregg discharged Hollifield in April of 2017, Byrne became the Sales Manager. (Cohen Aff. ¶ 5.)

50. Byrne had long felt that Internet Sales Manager Blazer delayed handing out leads that came in via web sources such that they were stale by the time they were given to salespersons. (Cohen Aff. ¶ 6.)

51. In late May Cohen decided to provide leads and access to leads to Byrne. (Cohen Aff. ¶ 7.)

52. After leads were directed to Byrne the percentage of leads that were converted to appointments and ultimately to sales was far higher. (Cohen Aff. ¶ 7.)

53. Cohen and the principal owner, James ("Jimmy") Glasgow had discussion regarding whether the Internet Sales employees were needed at the dealership. (Cohen Dep. 116; Cohen Aff. ¶ 8.)

54. Glasgow concluded that there was no need for the employees and both positions, Blazer and Spires, were to be eliminated. (Cohen Dep. 117; Cohen Aff. ¶ 8.).

55. On June 1, 2017 Byrne called Spires to his office. Then Human Resources Director Shannon Porche, who worked out of Louisiana, was on the phone. (Spires Dep. 103.)

56. Porche informed Spires that her position was being eliminated. (Spires Dep. 103; Exh. 7.)

57. Buddy Gregg did not hire anyone as a Web Assistant in 2017 and has not hired anyone as a Web Assistant to this day. (Cohen Aff. ¶ 11; Porche Dep. 119.)

6

58. On May 24, 2017 Byrne did not know of the decision to eliminate the internet sales positions, and it was not his to make. (Byrne Aff. ¶ 4.)

59. Although Byrne participated in some discussion the decision to eliminate the positions was made by ownership. (Byrne Aff. ¶ 4.)

Respectfully submitted this 22nd day of July, 2019.

/s/ Howard B. Jackson

Howard B. Jackson, BPR #021316
Ann E. Sartwell, BPR #021258
Wimberly Lawson Wright Daves & Jones, PLLC
P.O. Box 2231
Knoxville, TN 37901-2231
(865) 546-1000
(865) 546-1001 (fax)

Attorneys for Buddy Gregg Motor Homes, LLC

## CERTIFICATE OF SERVICE

I certify that the foregoing Statement of Undisputed Facts in Support of Motion for Summary Judgment was served on the following persons, via the Court's electronic filing system, this 22nd day of July, 2019:

Edward G. Phillips
Brandon L. Morrow
Kramer Rayson LLP
P.O. Box 629
Knoxville, TN 37901-0629

/s/ Howard B. Jackson
Howard B. Jackson