UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| LAUREN BLAZER, ERICA SPIRES, and, DAVID SANZ | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 3:18-CV-00097 ) ) |
| BUDDY GREGG MOTOR HOMES, LLC, | ) JUDGE: Greer ) MAGISTRATE: Guyton |
| Defendant. | ) ) |

MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SEPARATE TRIALS

I. INTRODUCTION

Buddy Gregg Motor Homes, LLC ("Buddy Gregg") submits that the claims of Plaintiff David Sanz ("Sanz") should be tried separately from those of Plaintiffs Lauren Blazer ("Blazer") and Erica Spires ("Spires"). Sanz alleges that he complained of alleged sexually improper conduct toward females (including Blazer and Spires) and racist comments about customers. He says that he was later discharged in retaliation for making those complaints, and for his religion. He further alleges that Buddy Gregg paid him less than required for sales commissions and interfered with his subsequent employment.

Plaintiffs Blazer and Spires allege that they were subjected to sexually inappropriate remarks and other improper conduct (which did not involve touching or sexual advances). They allege that Buddy Gregg discharged them based on their complaints.

Sanz' claims will be heard by a jury. Blazer and Spires signed jury waivers and their claims will be heard by the Court.

1

Buddy Gregg submits that forcing the Sanz jury to hear and sift through the presentation of Blazer and Spires' claims of alleged harassment and retaliation risks undue prejudice to Buddy Gregg and jury confusion that cannot be adequately mitigated via limiting instructions from the Court. There would be a substantial risk of the jury either believing that the entire case was about harassment, or painting Buddy Gregg with a broad brush based on allegations of Blazer or Spires that bear no relation to the questions of whether and when Sanz engaged in protected activity and whether or not Buddy Gregg separated him from employment because of such activity.

In short, Buddy Gregg respectfully submits that it will not receive a fair trial of the Sanz case unless it is tried separately from the claims of Blazer and Spires.

## II. FACTS

Buddy Gregg does not attempt to set out all facts relevant to the claims of each plaintiff. Instead, Buddy Gregg provides descriptions of the factual allegations of each such that the Court can properly analyze the factors at issue in the instant motion.

A. <u>Plaintiff Sanz' Allegations.</u>

Buddy Gregg employed Sanz as a salesperson. Sanz alleges that in January of 2017 he had a heated discussion with then General Sales Manager Travis Hollifield relative to a promised repair on an RV sold to a customer. (Sanz Dep. 33.) Per Sanz, he and the dealership had promised the customer to place a new ladder on the back of the vehicle. When Sanz saw the vehicle a shoddy repair had been done instead. Upon approaching Hollifield about the subject Hollifield became irate and the interaction escalated to the point that Sanz says Hollifield shoved him. Hollifield denies this. (Sanz Dep. 33-35; Hollifield Dep. 106.)

2

Per Sanz, about an hour later Hollifield asked Sanz to join him on a golf cart and the two went to see the vehicle. During the ride Hollifield referred to the customer as a "big ass n_____ _____" and said she had no business getting on a ladder. (Sanz Dep. 42.)

Sanz later related the incident to then Sevierville location manager Stephen Stitt. In turn, Stitt called the majority owner, James Glasgow. Stitt put Sanz on the phone with Glasgow, who said that the dealership would take care of the issue, or words to that effect. (Sanz Dep. 38.)

On or about January 25, 2017 Company President and minority owner Brad Cohen visited the dealership. Cohen and Controller Don Forbes (who also acted as a local human resources contact) met with Sanz. He described to them the interaction with Hollifield. Sanz says he told Cohen about Hollifield making racial remarks and inappropriate comments about females. (Sanz Dep. 44.) Cohen denies this. (Cohen Dep. 168-69.)

Sanz discussed Hollifield's drinking with Cohen, as well as alleged steroid use and alleged financial improprieties. (Sanz Dep. 47.) Sanz did not mention eventual Sales Manager Jerry Byrne to Cohen in this meeting, nor did Sanz discuss the meeting with Byrne later. (Sanz Dep. 48, 70).

After the January of 2017 meeting Sanz had no further hostilities with Hollifield. (Sanz Dep. 49.)

In April Buddy Gregg discharged Hollifield. Byrne replaced him.

Also in April Byrne raised a concern regarding Sanz. He and others spoke with Shannon Porche, who worked in Louisiana and provided human resources support for Buddy Gregg and other companies owned by Glasgow and Cohen. Byrne related that Sanz had difficulty getting along with others, was making the environment uncomfortable and was not following procedures. Porche spoke with a few other employees about this concern. She also spoke with Sanz. (Porche Dep. 47-49; Exh. 61.) Byrne considered discharging Sanz at that time but did not do so.

3

The claims of Blazer and Spires are discussed below. With respect to the timeline of events Buddy Gregg notes that it eliminated Spires' position on June 1, and Blazer's on June 21.

On June 28, 2017, Sanz gave a letter to Don Forbes, and e-mailed the same letter to Shannon Porche. (Exh. 40.) In that letter Sanz said he was being retaliated against based on his complaints about Hollifield, that he had been cut off from receiving an appropriate level of leads, and that Hollifield and Byrne had made inappropriate comments about females. He mentioned racial comments by Hollifield. (Exh. 40.) Porche says she had a lengthy conversation with Sanz. (Porche Dep. 102.) Sanz says he did not hear from her. (Sanz Dep.61.)

Sanz did not give the letter to Byrne, nor did he discuss with Byrne the alleged improper treatment of females by Byrne. (Sanz Dep. 66.)

In September of 2017 Sanz and salesperson Randy Thomas had an argument. Sanz had been told that Thomas was spreading rumors about him. Sanz went into Thomas' office and asked that Thomas stop doing so. An argument ensued. Byrne learned of it and issued both Sanz and Thomas a memo that said in essence they needed to treat each other respectfully at work. (Sanz Dep. 71, 76; Exh. 41.)

Byrne learned that Sanz had advised a temporarily unhappy customer to sue Buddy Gregg. Sanz denies this. (Sanz Dep. 76.) The customer has confirmed that Sanz made the suggestion. (Exh. 114, Price Aff .)

In October Byrne sent a memo to Cohen and Porche proposing a reorganization in the sales department. (Exh. 110.) Byrne proposed eliminating Sanz and three other salespersons and reassigning another. (Exh. 110.) Byrne noted that Sanz was lagging in sales, that he had exhibited some difficulties getting along with coworkers, and that he had advised a customer to sue the dealership. (Exh. 110.)

On October 13, 2017, Byrne let Sanz know he was being let go. (Sanz Dep. 88.) Sanz says Byrne did not give a reason. Sanz learned that the stated reason was a reorganization when he received a separation notice. (Sanz Dep. 119.)

Sanz also alleges that commission calculations were not accurate such that he should receive additional commission pay. He also claims that someone from Buddy Gregg interfered with his subsequent employment at Tennessee RV. This claim is the subject of a pending motion for partial summary judgment and Buddy Gregg does not repeat the facts of that issue here.

B. Plaintiff Spires' Allegations.

Buddy Gregg has filed a motion for summary judgment with respect to the claims of Spires. Rather than repeat the facts here Buddy Gregg incorporates by reference the facts set out in its memorandum in support of that motion. (Doc. 40, filed July 10, 2019.)

C. Plaintiff Blazer's Allegations

Buddy Gregg hired Blazer as a salesperson in 2014. She moved to the web/internet department in October of 2014. (Blazer Dep. 26-27.) She received a pay increase in March of 2015. (Blazer Dep. 29.) At that time she was reporting to Hollifield. (Blazer Dep. 30.)

For a period of time in 2016 Blazer helped out in the finance department and received some commissions for that work. In January of 2017 Cohen asked her if she wanted to continue working in finance and she said no. (Blazer Dep. 37.) She was taken out of those duties and received a salary increase because she would no longer be receiving the commissions via finance work. (Blazer Dep. 38-39.)

With respect to her harassment allegations, Blazer says Hollifield referred to Assistant Finance Manager Sandy Johnson as "jugs", referred to Blazer as "fancy pants" and "tits", and referred to Spires as "fancy pants". (Blazer Dep. 40.) Blazer did not ask Hollifield to stop referring to her in

5

that manner. (Blazer Dep. 41.) Hollifield's favorite word for "everyone" was cocksucker. (Blazer Dep. 41.)

On occasion Blazer rode with Hollifield in a vehicle or RV. Sometimes they went to lunch and sometimes to take pictures of an RV. On these occasions it was not unusual for them both to drink beer. (Blazer Dep. 118-20.)

Sometimes during the rides Hollifield exited the vehicle and urinated by the side of the road. Everyone knew Hollifield did this and he did it regardless of who was present. (Blazer Dep. 124.)

Blazer also referred to Hollifield's rant in October of 2016 where he used foul language, some of it sexual in reference, in a group meeting. It was clear to Blazer that Hollifield was angry during that rant. (Blazer Dep. 124.)

Blazer says Hollifield did not touch her or make a sexual advance. (Blazer Dep. 42.) That said, other witnesses observed that she and Hollifield were "inseparable" and two witnesses have stated that they observed Blazer and Hollifield engaging in physical relations of a sexual nature. (Chapman Dep. 39; Exh. 113, Byrne Aff. ; Exh. 116, Stitt Aff. .)

Blazer says that Byrne mentioned breasts often. Like Spires she alleges that overheard Byrne telling Justin Whitehead not to get his wife a "boob job" because that would lead to divorce. (Blazer Dep. 42-42.) She also says Byrne commented about a female customer who was getting off a golf cart to the effect that he should have known who it was because of her fake breasts. (Blazer Dep. 46-47.) (This is the same incident that Spires alleges and that supposed witness Rothenberger says he did not hear. (Exh. 115, Rothenberger Aff.)) Lastly with respect to Byrne, she says he told her about a woman at a place he had previously worked who had a large chest and large feet and made a comment about looking at or noticing her feet. (Blazer Dep. 47-48.)

6

Blazer says Eric Bivens made sexual innuendoes. When asked for an example she at first said she could not recall one. (Blazer Dep. 49.) She later said that Bivens told warranty clerk Angela Seiber that she would get a raise if she wore a low-cut shirt. (Blazer Dep. 50.)

Once when Blazer was at the Sevierville location Stephen Stitt said she looked "awfully perky" that day in an apparent reference to her breasts. Afterward she did not want to go to the Sevierville store. (Blazer Dep. 53.)

Blazer says Randy Thomas spread rumors of her having affairs. (Blazer Dep. 54.) Blazer complained to Hollifield about the rumors. He had a meeting with salespersons and said the rumors must stop. Afterward she heard no more about such rumors. (Blazer Dep. 86-88.)

Former salesperson Darren DeRosset showed her his cell phone with a pornographic video playing and asked Blazer if she thought the woman was beautiful. (Blazer Dep. 57.) DeRossett did this in 2014. (Blazer Dep. 58.) She told Forbes in 2017 because she heard that Buddy Gregg was considering bringing DeRosset back to work. (Blazer Dep. 57.)

Blazer's allegations with respect to events from January of 2017 forward are as follows. Spires called Blazer on Blazer's day off and told her about the argument between Sanz and Hollifield. Blazer called Cohen to let him know, and to tell him that two employees in the internet department, Travis Smith and Justin Whitehead, were behaving as though they did not report to her. They appeared to be taking direction from Hollifield and Byrne. (Blazer Dep. 60-61.)

Cohen arranged a conference call the following day, when Blazer was back at work. On the call he told Smith and Whitehead that they reported to Blazer and would do so if they wished to work at the dealership. (Blazer Dep. 63.) Soon afterward Smith obtained a transfer to the sales department and Whitehead transferred to work in the finance department. (Blazer Dep. 64.)

7

As noted above Cohen came to the dealership in late January. Blazer did not complain to him during his visit. (Blazer Dep. 66.)

Blazer says that at some point while Cohen was still at the dealership in January he asked her if she would like to have Spires work with her. Blazer said yes. (Blazer Dep. 67.) Spires transferred to the internet department in about March, and Blazer was her supervisor. (Blazer Dep. 68.) We note that Cohen agrees Spires was transferred to the internet department but his testimony is that this was at Blazer's request. (Cohen Dep. 166-67.) In addition, Paul Chapman testified that Blazer and Spires "had a plot" to have Spires work as Blazer's assistant. (Chapman Dep. 55.)

On June 2, 2017 – the day after Spires' position was eliminated – Blazer sent a letter to Don Forbes. (Exh. 18.) In her letter she said she feared her fate would be the same as Spires. By this date she felt her job was in jeopardy. (Blazer Dep. 72-73.) She had not complained to management before regarding the concerns in her letter. (Blazer Dep. 68-69.) Note that the June 2 letter makes no mention of anyone allegedly harassing Blazer on the basis of sex. Rather, she is concerned that the distribution of internet leads had been removed from her duties. (Blazer Dep. 73-74; Exh. 18.)

With regard to the distribution of leads, as noted in the memo in support of the motion for summary judgment with respect to Spires, Buddy Gregg obtained far better results by sending internet leads directly to Byrne. Buddy Gregg eliminated Spires' position promptly, on June 1. Buddy Gregg wanted to have another employee in place to take pictures, and to assist with on-site IT duties, before releasing Blazer. Buddy Gregg hired Jay Staley for that position effective June 13, 2017. (Exh. 111.)

Also on June 13, Blazer sent a second letter of complaint. (Exh. 19.) In it she refers to "corporate" having been told about Hollifield's inappropriate comments. This was Spires' report in January, not a complaint raised by Blazer previously. (Blazer Dep. 76.)

8

In the June 13 letter Blazer refers to Hollifield and Byrne making inappropriate comments about females. Of course Hollifield was no longer there, having been discharged in April. This was Blazer's first report to management of such allegations. (Blazer Dep. 78-79.)

On the afternoon of June 13 Forbes arranged a call wherein Blazer spoke with Shannon Porche about the concerns Blazer raised in the letter. (Blazer Dep. 81-82.) Porche stated that no one should be treated that way or words to that effect. (Blazer Dep. 81-82.)

Porche testified that she told Cohen about Blazer's letter after getting of the phone. Cohen responded that the decision had been made to eliminate the position in any event. (Porche Dep. 70.) (There are e-mails from after June 13 between Byrne and Porche discussing a new position for Blazer. Glasgow and Cohen were not copied on the e-mails and never agreed to any such new position.)

On June 21, 2017 Byrne let Blazer know she was being separated from employment. (Blazer Dep. 89-90.) He referred to a failure to follow procedures. The State Separation Notice says the position was eliminated, which was the case. (Exh. 112.)

## III. ARGUMENT AND CITATION TO AUTHORITY

A. The Court May Order Separate Trials To Avoid Prejudice Or Confusion To The Jury.

Federal Rule of Civil Procedure 42(b) provides, in part: "For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims."

The decision whether to order separate trials is within the trial court's discretion. Clay v. UPS, Inc., 2007 U.S. Dist. Lexis 82873at *4 (U.S.D.C. N.D. Ohio 2007), citing Saxton v. Titan-C Manu., 86 F.3d 553, 556 (6th Cir. 1996). When deciding whether separate trials should be ordered the court should consider matters such as "the potential prejudice to the parties, the possible

9

confusion of the jurors, and the resulting convenience and economy." Id. citing Wilson v. Morgan, 47 F.3d 326, 339 (6th Cir. 2007) (citation and quotations omitted). The "major consideration is directed toward the choice most likely to result in a just final disposition of the litigation." Lee v. Dell Products, L.P., 2006 U.S. Dist. Lexis 75573 at *32 (M.D. TN 2006) (citation and quotation omitted).

In Clay, for example, the court ordered separate trials of the claims raised by three plaintiffs. The facts of each case differed significantly. The plaintiffs were employed at separate locations. They had different job duties and worked for a variety of different supervisors. Accordingly, the jury could easily become confused by the various factual backgrounds and legal claims submitted by the various plaintiffs such that separate trials were in order. Id. at *5.

B. The Court Should Order The Sanz Case Tried Separately From Those Of Blazer And Spires.

In the instant case the Court should order separate trials of the Sanz case from those of Blazer and Spires. If all three cases are tried together there is great potential for undue prejudice to Buddy Gregg from the jury hearing the claims of Blazer and Spires together with those of Sanz.

Sanz claims retaliation based on having reported concerns over treatment of female employees and racial comments regarding customers. It would be inappropriate and very likely confusing for the jury to have a "trial within a trial" with respect to whether or not someone at Buddy Gregg in fact engaged in unlawful harassment of females, such as Blazer or Spires. In a retaliation claim the report itself is the relevant matter, not whether the reported concern is in fact valid. See generally EEOC v. New Breed Logistics, 783 F.3d 1057 (6th Cir. 2015) (Discussing nature of opposition clause as protected activity.)

10

Sanz can of course describe the nature of the conduct that he observed and allegedly complained about. Such testimony is more than sufficient to apprise the jury of the nature of the conduct he allegedly reported. From that testimony the jury can clearly understand the nature of the complaint Sanz made or allegedly made and determine whether it constituted protected activity or not.

If Blazer and Spires present their harassment claims before the jury the jury would hear a substantial amount of evidence that bears no relevance to whether Sanz made a protected complaint at a given time, and if so whether anyone at Buddy Gregg retaliated against him for doing so. Hearing such evidence that relates to Blazer and Spires' independent claims that they were in fact harassed would create a significant risk of the jury viewing the entire matter as a harassment case when Sanz' claim is for retaliation. Such jury confusion would unduly prejudice Buddy Gregg.

The Court can of course give limiting instructions and apprise the jury that Sanz' claims involve only retaliation, not harassment. Buddy Gregg respectfully submits that with the amount of testimony necessary relative to the alleged conduct of Hollified, Byrne and others and regarding Buddy Gregg's response to same via Cohen and Porche, the sheer amount of testimony and evidence that the jury would be required to hear and sift through would create a significant risk of jury confusion and undue prejudice to Buddy Gregg, notwithstanding any limiting instruction.

Additionally, Blazer and Spires assert that Buddy Gregg discharged them in retaliation for having reported concerns. Their allegation that Buddy Gregg retaliated against them in June are clearly irrelevant to Sanz' claim that Buddy Gregg retaliated against him by reducing his access to leads and then terminating his employment in October. Hearing allegations of retaliation against other employees that is not relevant to the question of whether someone retaliated against Sanz

11

presents the danger of confusion and of the jury ruling against Buddy Gregg in the Sanz claim based on its dislike of a fact that relates only to Blazer or Spires. This is again the sort of unfair prejudice that Rule 42(b) exists to prevent.

In short, Buddy Gregg should not be forced to defend two harassment claims by two plaintiffs and two retaliation claims by those same plaintiffs within the context of a retaliation claim by a third plaintiff. Rather, the Sanz retaliation and discrimination claim should stand on its own. This result would be "the choice most likely to result in a just final disposition of the litigation." Lee, 2006 U.S. Dist. Lexis 75573 at * 32.

Further, the trials can be conducted separately in a manner that makes efficient use of the court and jury's time. The Sanz case could be tried first and the matter given to the jury for decision. While the jury is deliberating the parties can move on to present evidence related to the Blazer and Spires (if necessary) claims to the Court. In that way the jury would not be required to sit through the presentation of evidence regarding claims that it is not adjudicating. And the Court could hear the evidence relative to the other claims in a timely manner.

## IV.  CONCLUSION

To avoid undue prejudice and significant risk of jury confusion that would result in unfairness to Buddy Gregg the Court should order that the claims of Sanz will be tried separately from those of Blazer and Spires.

Respectfully submitted this 4th day of November, 2019.

/s/ Howard B. Jackson

Howard B. Jackson, BPR #021316
Wimberly Lawson Wright Daves & Jones, PLLC
P.O. Box 2231
Knoxville, TN 37901-2231
(865) 546-1000
(865) 546-1001 (fax)

12

Mary C. Moffatt, BPR #012729
Wimberly Lawson Wright Daves & Jones, PLLC
929 West First North Street
Morristown, TN 37814
(423) 587-6870
(423) 587-1479 (fax)

Attorneys for Buddy Gregg Motor Homes, LLC

## CERTIFICATE OF SERVICE

I certify that the foregoing Memorandum in Support of Motion for Separate Trials was served on the following persons, via the Court's electronic filing system, this 4th day of November, 2019:

Edward G. Phillips
Brandon L. Morrow
Kramer Rayson LLP
P.O. Box 629
Knoxville, TN 37901-0629

/s/ Howard B. Jackson
Howard B. Jackson

## List of Exhibits

| | | |
|---|---|---|
| 18 | - | June 2, 2017 E-mail from Blazer |
| 18 | - | June 13, 2017 E-mail from Blazer |
| 40 | - | June 28, 2017 E-mail from Sanz |
| 41 | - | Memo from Byrne to Sanz and Thomas |
| 61 | - | Shannon Porche Notes |
| 110 | - | Memo from Byrne to Cohen and Porche |
| 111 | - | Personnel Change Authorization, Staley Hired June 13, 2017 |
| 112 | - | Separation Notice, Blazer, June 21, 2017 |

Affidavits

| | | |
|---|---|---|
| 113 | - | Jerald Byrne |
| 114 | - | Philip Price |
| 115 | - | Mark Rothenberger |
| 116 | - | Stephen Stitt |

Deposition Excerpts

| | | |
|---|---|---|
| 117 | - | Lauren Blazer |
| 118 | - | Paul Chapman |
| 119 | - | Brad Cohen |
| 120 | - | Travis Hollifield |
| 121 | - | Shannon Porche |
| 122 | - | David Sanz |

14

Case 3:18-cv-00097-DCLC-HBG   Document 65   Filed 11/04/19   Page 14 of 14   PageID #: 1044